**ORAL ARGUMENT NOT YET SCHEDULED**

_____

No. 24-5199
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

ADELE E. RUPPE,

*Appellant*,

---v.---

MARCO RUBIO,
Secretary of State,
U.S. Department of State,

*Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA FOR REVIEW OF JULY 3, 2024,
MEMORANDUM OPINION AND ORDER OF
CASE NO. 1:17-cv-02823-ABJ

_____

**BRIEF OF APPELLANT ADELE E. RUPPE**
_____

Kevin E. Byrnes, DC Bar No. 480195
**Fluet**
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
T: (703) 590-1234
F: (703) 590-0366
KByrnes@fluet.law
*Counsel for Appellant*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

**A.    <u>Parties</u>**

The following parties, intervenors, and amici curiae appeared before the District Court:

1.  Plaintiff in this matter is Adele E. Ruppe, ("Ruppe").

2.  Defendant in this matter is Marco A. Rubio,[1] in this official capacity as Secretary of State, of the U.S. Department of State, (the "Agency").

The following parties, intervenors, and amici curiae appeared before the District Court:

3.  Appellant in this matter is Adele E. Ruppe, ("Ruppe").

4.  Appellee in this matter is Marco A. Rubio, in this official capacity as Secretary of State, of the U.S. Department of State, (the "Agency").

5.  Amici Curiae, if any, are currently unknown.

**B.    <u>Rulings</u>**

At issue in this appeal is the July 3, 2024, Order and Memorandum Opinion of the Honorable Amy Berman Jackson granting the Defendant's Motion for Summary Judgment as to Counts I, II, IV, V, VI, and VII; denying the Plaintiff's

---

[1] Under Fed. R. App. P. 43(c), when a public officer who is a party in an official capacity "ceases to hold office," the officer's successor is "automatically substituted as a party" in the pending action.

ii

Cross-Motion for Summary Judgment as to Count III, and transferring Count III to the Court of Federal Claims.

### C.  **Related Cases**

This case has not previously been before this Court. The Final Order transferred Count III to the Court of Federal Claims, but no case number has been assigned at the Court of Federal Claims as of the date of this filing. Appellant is not aware of any related cases pending before this Court. Appellant has a pending case against the Appellee before the Equal Employment Opportunity Commission, Case No. 570-2024-01306X, before Administrative Judge Linda Tran for separate claims against the same employer.

## **<u>TABLE OF CONTENTS</u>**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES............... ii

   A.    Parties.......................................................................................... ii

   B.    Rulings ........................................................................................ ii

   C.    Related Cases ............................................................................. iii

TABLE OF CONTENTS ...................................................................... iv

TABLE OF AUTHORITIES ................................................................. vi

GLOSSARY DEFINING ABBREVIATIONS AND ACRONYMS ........................1

JURISDICTIONAL STATEMENT ...........................................................2

STATEMENT OF THE ISSUES ..............................................................3

STATUTES AND REGULATIONS ...........................................................4

STATEMENT OF THE CASE..................................................................4

   A.     BACKGROUND ......................................................................6

ARGUMENT ...................................................................................11

   I.    Standard Of Review ..................................................................11

   II.   The District Court Erred in Granting Summary Judgment on Ruppe's Non-Selection Claim (Count I)..........................................................12

      A.   The District Court Misapplied the Law by Finding that Ruppe's Withdrawal from Promotion Consideration "Negates" her Discrimination Claim ................................................................12

      B.   The District Court Incorrectly Rejected Ruppe's Argument that the Application was Futile .................................................................16

   III.  The District Court Erred in Not Denying the Motion to Amend Answer..20

      A.   Amendment of an Answer to Conform to Discovery Evidence Should be Disallowed when Amendment Comes after Summary Judgment Briefing has Begun ..................................................................................20

B.   Amendment of an Answer to Conform to Discovery Evidence Should be Disallowed when the Only Discovery Evidence Relied on to Amend the Answer is Favorable Deposition Testimony Elicited by the Movant and When Witness's Credibility is at Question .............................................23

IV.  A Reasonable Juror could Agree that Agency's Denial of Performance Pay to Ruppe was Discriminatory (Count II). ...................................................24

V.   The Court Erred when it transferred Ruppe's EPA claims to the Court of Federal Claims (Count III)..........................................................................26

A.   The District Court Can Retain Jurisdiction over the Equal Pay Act Claim under *United States v. Bormes* .................................................................26

VI.  Administrative Exhaustion did not Bar Ruppe's Disparate Impact Claim (Count IV)..............................................................................................29

A.   An EEO Formal Complaint Was Sufficient to support Ruppe's Allegations of Disparate Impact .........................................................29

B.   Ruppe's Disparate Impact Claims are "Like or Reasonably Related to" Her Allegations in the EEO Complaint....................................................33

VII. The Court Improperly Granted Summary Judgment on Ruppe's Retaliation Claim ........................................................................................................36

A.   A Reasonable Jury Could Have Found that Ruppe was Retaliated Against for Expressing Opposition to Unlawful Title VII Practices ......36

B.   The Temporal Proximity between Ruppe's Activity and the Retaliatory Acts Supported an Inference of Causation...............................................39

VIII. ....The Court Improperly Granted Summary Judgment on Ruppe's Hostile Work Environment Claim..........................................................................42

IX.  Ruppe Successfully Showed that she was Discriminated Against in Violation of the Rehabilitation Act ........................................................46

CONCLUSION ....................................................................................................54

CERTIFICATE OF COMPLIANCE ...................................................................55

CERTIFICATE OF SERVICE .............................................................................56

## TABLE OF AUTHORITIES

**Cases**

*Abbey v. United States*
  745 F.3d 1363 (Fed. Cir. 2014)..............................................................28

*Acosta–Mestre v. Hilton Int'l of P.R., Inc.*
  156 F.3d 49 (1st Cir. 1998)..................................................................22

*Adair v. Bureau of Customs & Border Prot.,*
  191 F. Supp. 3d 129 (D.D.C. 2016).......................................................28

*Allen v. Napolitano*
  774 F. Supp. 2d 186(D.D.C. 2011).......................................................42

*Am. Wildlands v. Kempthorne*
  530 F.3d 991 (D.C. Cir. 2008) ..............................................................22

*Anderson v. Liberty Lobby*
  477 U.S. 242 (1986) .......................................................................11, 12

*Beeck v. Federal Exp. Corp.*
  81 F.Supp.2d 48 (D.C. Cir. 2000).........................................................37

*Black v. Pan Am. Labs., L.L.C.*
  646 F.3d 254 (5th Cir. 2011)................................................................44

*Brady v. Office of Sergeant at Arms*
  520 F.3d 490 (D.C. Cir. 2008) ..............................................................49

*Broderick v. Donaldson*
  437 F.3d 1226 (D.C. Cir. 2006).............................................................38

*Burt v. Nat'l Republican Club of Capitol Hill*
  509 F. App'x 1 (D.C. Cir. 2013) ...........................................................13

*Burt v. Nat'l Republican Club of Capitol Hill*
   828 F. Supp. 2d 115 (D.D.C. 2011) ............................................................. 13, 14

*Carroll v. England*
   321 F. Supp. 2d 48 (D.D.C. 2004).........................................................................18

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986) ............................................................................................12

*Chappell-Johnson v. Powell*
   440 F.3d 484 (D.C. Cir. 2006) .............................................................................11

*Chisholm v. United States Postal Service*
   665 F.2d 482 (4th Cir.1981).................................................................................33

*Clark Cty. Sch. Dist. v. Breeden*
   532 U.S. 268 (2001) ............................................................................................39

*Conway v. Principi*
   2005 WL 2230294 (N.D. W.V. Sept. 13, 2005)........................................... 44, 45

*Crawford v. Duke*
   867 F.3d 103 (D.C. Cir. 2017) .............................................................................29

*Douglas v. Donovan*
   559 F.3d 549 (D.C. Cir. 2009) .............................................................................29

*Dreiband v. Nielsen*
   319 F. Supp. 3d 314 (D.D.C. 2018).....................................................................28

*EEOC v. BCI Coca-Cola Bottling Co. of L.A.*
   450 F.3d 476 (10th Cir. 2006)..............................................................................50

*EEOC v. Flasher Co.*
   986 F.2d 1312 (10th Cir. 1992)............................................................................25

*EEOC v. Graceworks Lutheran Servs.*
  No. 3:15-CV-261, 2016 WL 3387310 (S.D. Ohio June 15, 2016)......................19

*Figueroa v. Pompeo*
  923 F.3d 1078 (D.C. Cir. 2019) ......................................................... 25, 51, 53, 54

*Fort Bend County, Texas v. Davis*
  587 U.S. 541 (2019) ...................................................................................32

*Greenberg v. Food & Drug Admin.*
  803 F.2d 1213 (D.C. Cir. 1986) ...........................................................12

*Hamilton v. Geithner*
  666 F.3d 1344 (D.C. Cir. 2012) ....................................................... 39, 40

*Harris v. Forklift Systems, Inc.*
  510 U.S. 17 (1993) ...................................................................................43

*Hazel v. WMATA*
  No. 02–1375, 2006 WL 3623693 (D.D.C. Dec. 4, 2006) ...................................33

*Houle v. Walmart Inc.*
   447 F. Supp. 3d 261 (M.D. Pa. 2020).....................................................35

*Int'l Bhd. of Teamsters v. United States*
  431 U.S. 324 (1977) ....................................................................... 17, 18, 19, 20

*Johnson v. Lightfoot*
  273 F. Supp. 3d 278 (D.D.C. 2017).....................................................28

*Johnson v. Perez*
  823 F.3d 701 (D.C. Cir. 2016) ...........................................................12

*Jones v. Bernanke*
  557 F.3d 670 (D.C. Cir. 2009) ...........................................................40

*Josephs v. Pac. Bell*
    443 F.3d 1050 (9th Cir. 2006)...............................................................29

*Klunder v. Brown University*
    778 F.3d 24 (1st Cir. 2015) ..................................................................22

*Lathram v. Snow*
    336 F.3d 1085 (D.C. Cir. 2003) ...........................................................17

*Lee v. Mabus*
    955 F. Supp. 2d 33 (D.D.C. 2013)................................................. 14, 15

*Leykum v. U. of Texas Health Sci. Cent.*
    2021 WL 12310746 (W.D. Tx. Nov. 22, 2021) ....................................35

*Marshall v. Federal Exp. Corp.*
    130 F.3d 1095 (D.C. Cir. 1997) ...................................................... 29, 32

*Ososky v. Wick*
    704 F.2d 1264 (D.C. Cir. 1983) ...........................................................28

*Paquin v. Federal Nat. Mortg. Ass'n*
    119 F.3d 23 (D.C. Cir. 1997) ...............................................................37

*Park v. Howard Univ.*
    71 F.3d 904 (D.C. Cir. 1995) ...............................................................33

*Parker v. Balt. & O. R. Co.*
    652 F.2d 1012 (D.C. Cir. 1981) ...........................................................37

*Payne v. District of Columbia*
    722 F.3d 345 (D.C. Cir. 2013) .............................................................47

*Payne v. District of Columbia*
    741 F. Supp. 2d 196 (D.D.C. 2010).....................................................47

*Payne v. Salazar*
   619 F.3d 56(D.C. Cir. 2010) ................................................................32

*Ponce v. Billington*
   652 F. Supp. 2d 71 (D.D.C. 2009)........................................................22

*Postal Serv. Bd. of Governors v. Aikens*
   460 U.S. 711 (1983).............................................................................51

*Rattigan v. Gonzales*
   503 F. Supp 2d 56 (D.D.C. 2007).........................................................38

*Reeves v. Sanderson Plumbing Prods.*
   530 U.S. 133 (2000) .......................................................................11, 12

*Rollins v. Traylor Bros., Inc.*
   2016 WL 258523 (W.D. Wash. Jan. 21, 2016).....................................34

*Roman v. Castro*
   149 F.Supp.3d 157 (D.D.C. 2016)................................................ 41, 47

*Schandelmeier-Bartels v. Chicago Park Dist.*
   634 F.3d 372 (7th Cir. 2011).................................................................50

*Shehadeh v. Chesapeake & Potomac Tel. Co. of Md.*
   595 F.2d 711 (D.C. Cir. 1978) ..............................................................29

*Singletary v. Dist. Of Columbia*
   351 F.3d 519(D.C. Cir. 2003) ...............................................................40

*Smith v. Blinken*
   No. 1:18-CV-03065 (CJN), 2021 WL 3737455 (D.D.C. Aug. 24, 2021) ............26

*Staub v. Proctor Hospital*
   562 U.S. 411 (2011)...............................................................................47

x

*Steger v. Gen. Elec. Co.*
 318 F.3d 1066 (11th Cir. 2003)..................................................................52

*Sumner v. U.S. Postal Serv.*
 899 F.2d 203 (2nd Cir. 1990)....................................................................37

*TSC Industries, Inc. v. Northway, Inc.*
 426 U.S. 438 (1976) ...................................................................................12

*United States v. Bormes*
 568 U.S. 6 (2012) ........................................................................ 26, 27, 28

*Walker v. Johnson*
 798 F.3d 1085 (D.C. Cir. 2015) ................................................................48

*Waters v. Rumsfeld*
 320 F.3d 265 (D.C. Cir. 2003) ........................................................... 26, 27

*Williams v. Johnson*
 701 F.Supp.2d 1 (D.D.C. 2010)..................................................................47

**Statutes**
28 U.S.C. § 1291 ..........................................................................................2
28 U.S.C. § 1331 ..........................................................................................2
29 U.S.C. § 206(d) ........................................................................................5
29 U.S.C. § 216 ..........................................................................................27
42 U.S.C. § 12102(1) ..................................................................................46
42 U.S.C. § 2000e ........................................................................................2

**Rules**
Fed. R. Civ. P. 15(b)(2) ..............................................................................23
Fed. R. Civ. P. 56(a) ..................................................................................11

## <u>GLOSSARY DEFINING ABBREVIATIONS AND ACRONYMS</u>

| | |
|---|---|
| District Court | District Court for the District of Columbia |
| DCM | Deputy Chief of Mission |
| Dkt. | Docket entry numbers in the court below, D.D.C. No. 17-cv-02823-ABJ (used for citations in initial briefs and citations to record items not included in the Joint Appendix). Page citations to those documents refer to the page numbers assigned by the District Court's ECF system. |
| EEOC | Equal Employment Opportunity Commission |
| EPA | Equal Pay Act of 1963, as amended |
| EUR/PD | Bureau of European and Eurasian Affairs |
| FRCP | Federal Rules of Civil Procedure |
| JA | Joint Appendix (used for citations in final briefs) |
| MC | Minister Counselor, a rank of Senior Foreign Service Officer |
| OC | Officer Counselor, a rank of Senior Foreign Service Officer |
| Rehabilitation Act | Rehabilitation Act of 1973, as amended |
| SFS | Senior Foreign Service |
| State Department | United States Department of State |
| This Circuit | United States Court of Appeals for the District of Columbia |
| Title VII | Title VII of the Civil Rights Act of 1964, as amended |

## JURISDICTIONAL STATEMENT

Appellant Adele Ruppe ("Appellant" or "Ruppe") is an experienced Senior Foreign Service Officer who filed a civil action against the Secretary of the United States Department of State, in his official capacity. Dkt. 1. The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and Title VII of the Civil Rights Act of 1964, (42 U.S.C. § 2000e ("Title VII")), the Rehabilitation Act of 1973, and the Equal Pay Act of 1963, as amended.

Ruppe timely filed her Notice of Appeal on August 2, 2024, from the July 3, 2024, Order issued by the United States District Court for the District of Columbia, ("District Court") granting Defendant's Motion for Summary Judgment, which disposed of, or transferred, all Plaintiff's claims. Dkt. 88 ("Mem. Op."); Dkt. 90.

As this appeal arises from a final, appealable Order of the District Court, issued July 3, 2024, the United States Court of Appeals for the District of Columbia Circuit ("this Circuit") has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether the District Court erred in granting Defendant-Appellee's motion for summary judgment with respect to counts I (Title VII discrimination claim due to non-selection), II (disparate treatment sex discrimination), IV (Title VII disparate impact based on gender claim), V (Title VII retaliation for prior protected activity), VI (Title VII hostile work environment claim), and VII (Rehabilitation Act disability discrimination claim).

2.      Whether the District Court erred in denying Plaintiff-Appellant's motion for summary judgment as to count III (Equal Pay Act Claim).

3.      Whether the District Court erred when it determined Appellant had voluntarily withdrawn from seeking careers enhancing positions, when, in fact the unexplained removal of the appellant from the "short list" of applicants rendered selection practically impossible.

4.      Whether the District Court erred when it failed to treat Defendant's admission in its answer to the complaint as conceded and failed to rule on Plaintiff's requests to treat it as such on the issue of discrimination based on disability under Count VII.

5.      Whether the District Court erred in denying Plaintiff-Appellant's motion for spoliation sanctions (Dkt. 49; Dkt. 63).

## STATUTES AND REGULATIONS

All relevant statutes, rules, and constitutional provisions are included in the appellant's brief where they are relevant to the Counts in her Amended Complaint.

## STATEMENT OF THE CASE

Appellant Adele Ruppe's ("Ruppe") record of exceptional service at the Department of State spans three decades. Dkt. 71-2 at 8, Dkt. 71-3 at 118-124. She began her career at the Department in 1994 as a Foreign Service Officer. *Id*. During critical times for the nation's security, Ruppe served as the Office Director of Public Diplomacy Office for the Bureau of European and Eurasian affairs ("the Bureau"), overseeing the Bureau's development and coordination of efforts to counteract Russian disinformation efforts that are designed to undermine western democracy in Europe and America. *Id*. The Bureau of European and Eurasian Affairs is the State Department's largest regional bureau, overseeing a Public Diplomacy staff of about 700, a roughly $200 million budget, across 49 missions. *Id*. Despite her significant responsibilities, Ruppe was paid a lower base salary than all male Office Directors during her tenure. *Id*. at 20.

Ruppe filed this action to challenge the long-standing structural barriers to equal pay and the antiquated—yet pervasive—workplace misconduct that contributed to the environment of entrenched pay disparity and kept female workers from assuming higher status roles and receiving performance bonuses. Ruppe

challenged the Department's pay structure that resulted in her and her female colleagues being paid less than their male colleagues in violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d). Dkt. 12 at 20 (Am. Compl. ¶ 137-143). Ruppe also argued (1) that the Department violated her rights under Title VII of the Civil Rights Act by discriminating against her because of sex, (2) that her supervisors retaliated against her when she protested against inappropriate treatment of female employees, (3) that her supervisors subjected her to a hostile work environment, and (4) that they discriminated against her in violation of the Rehabilitation Act on the basis of a perceived disability. *Id*. at 2 (Am. Compl. ¶3).

Despite Ruppe's evidence confirming her suspicions of unequal treatment obtained through an excruciatingly long discovery process, the Agency withheld crucial witnesses and information from her, spoliated evidence related to her claims, and yet still prevailed. The District Court, through a jaundiced application of various limitations (causation, exhaustion of administrative remedies, the District Court's own jurisdiction, and others), has improperly deprived Ruppe of the chance to make her case to a jury. By resolving every doubt in gray areas of Title VII in favor of the Agency, the decision below evidenced improper judicial abstinence and imposed an impermissibly higher bar than precedents set for Title VII plaintiffs. The D.C. Circuit should remove the artificial hurdles the District Court imposed on Ruppe's claims,

reverse Defendant's summary judgment victory, and allow Ruppe let her make her case to a jury.

## A.    **BACKGROUND**

This appeal raises two principal issues involving discriminatory practices at the Department and how they harmed Ruppe, a Senior Foreign Service Officer with excellent performance evaluations. The first involves the Agency's noncompliance with the Equal Pay Act and Title VII. The second issue in this appeal concerns retaliation for protected disclosures Ruppe made regarding mistreatment of female employees.

As to the first issue, record evidence showed that Ruppe was paid less than her male counterparts in violation of these federal laws. In fact, despite her tremendous qualifications and experience, the investigation into Ruppe's pay showed that she "was the lowest paid employee promoted to the FE-OC ["senior foreign service counselor"] in 2011." Dkt. 88 at 11, Dkt. 75 at 5 (Filed under seal). Ruppe has been underpaid, significantly, in comparison to her male counterparts due to the Department's "rank-in-person system" whereby employees' salaries are not determined by rank, level of effort, or skills and responsibility. Dkt. 71-2 at 7-8, Dkt. 71-3 at 234-86. Instead, pay is calculated as a multiplier of basic pay once an employee enters Senior Foreign Service. *Id*. The Agency's policies of promoting women faster to improve diversity leads to them receiving lower incoming SFS basic

6

pay, because they spent less time in the Foreign Service before promotion. *Id*. By starting with a lower base salary, applying raises using the same percentage means lower pay over the long term. Ruppe experienced this repeatedly. Dkt. 77 at 21, Dkt. 37 at 155-78, Dkt. 75 at 5 (PEX 4, filed under seal), Dkt. 71-3 at 118-124 (PEX 18), Dkt. 85.

As to the second issue, Ruppe is a Senior Foreign Service ("SFS") Officer who achieved the rank of Minister Counselor. Dkt. 88 at 2. Despite extensive experience in recognizing and counteracting disinformation in areas of critical geopolitical importance, she was not selected for two Deputy Chief of Mission roles for which she was highly qualified. Dkt. 88 at 7-8.

Ruppe was not selected for a Deputy Chief of Mission position because she consistently protested inappropriate work treatment from male deputies. Dkt. 88 at 2-5. When Ruppe became the Office Director for the EUR/PD Office, female desk officers informed her that male deputy directors had harassed and bullied female subordinates. *Id*. at 3-4. At the time, Ruppe disclosed the behavior to HR Director and European Bureau Executive Director, Heather Townsend. *Id*. Ruppe also complained to the European Bureau Principal Deputy Assistant Secretary John Heffren, and her supervisor, Deputy Assistant Secretary Benjamin Ziff. *Id*. The Agency policy required these officials to treat Ruppe's concerns as an EEO complaint, but they did not. Dkt. 71-2 at 9; Dkt. 71-3 at 5-17. Rather than address

this underlying misconduct by male supervisors, Ms. Ruppe was later retaliated against and branded as an ineffective manager. Dkt. 71-2 at 10, Dkt. 71-3 at 126-48 (PEX 20, 21) at 10. Such reputational damage was problematic, given that Ruppe followed the guidance she received when she reported the issue to Ms. Townsend. Dkt. 71-2. at 9, Dkt. 68 at 137-38, Dkt. 143-47 (DEX 40, 43, Filed Under Seal).

Instead of referring to EEO consistent with Agency policies, Townsend told Ruppe to conduct a "climate survey" and discuss the complaint with the Department's Ombudsman's Office. Dkt. 71-2 at 9.. Ruppe reported the incidents to that office around February and March of 2015. Dkt. 88 at 33. Then, in June of 2015, Ruppe contacted that office again to report a "personnel issue" and asked the office to conduct a "climate survey," which involves the Ombudsman Office actively interviewing people in the office to investigate the reported issues. *Id*. at 3, 33. Specifically, Ruppe asked the office to investigate her concerns that "[m]ost of the office," say that they "have witnessed toxic or destructive behaviors," often manifesting as "malicious gossip." *Id*. at 3.

That summer, Ruppe also had a series of conversations with Ziff and Heffren about the treatment of female workers in the office at the hands of her male deputies, which occurred outside her presence. Dkt. 71-1 at 9. Ziff and Heffren took no action. Dkt. 88 at 4-5. Subsequently, Ruppe observed the same destructive and toxic behavior in Ziff. Dkt. 71-2 at 45-6. Ziff routinely subjected Ruppe to his

inappropriately sexist observations that manifested his biased perceptions toward female coworkers. *Id*. *See also* Dkt. 67-2 at 330-352. Ruppe also observed that female foreign service officers continued to receive inappropriate attention from Ziff. Dkt. 71-2 at 9-10. Ruppe persisted, pressed the matter, and complained about her male deputies to Heffern in August of 2015. *Id*. at 10. Heffern testified that he made sure that Ziff was aware of "this perception" that Ziff was improperly favoring certain female officers. Dkt. 67-2 at 290. Ziff retaliated by excluding Ruppe from office meetings. Dkt. 71-3 at 126-48, PEX 20, 21. Dkt. 71-2 at 10. He criticized Ruppe's performance by telling her she was difficult and demanding and that she should stay in her office. *Id*. Ziff also accused Ruppe of being "paranoid" and passive aggressive, accusing her of micromanagement. *Id*. Ruppe's attempt to challenge her male coworker's biased attitudes and behavior and her desire to cure the hostile environment of the workplace torpedoed Ruppe's chances for promotion. Dkt. 85-6.

As the next step in her career, Ruppe submitted three bids to serve as the Deputy Chief of Mission ("DCM") at a U.S. embassy or mission within the Bureau of European and Eurasian Affairs (for Sofia, Sarajevo, and Vienna). Dkt. 88 at 5-6. Applying for such positions is complicated, and involves "bids" for each role, with extensive materials in support of each application. *Id*. The bids required "360 surveys" of Ruppe's colleagues, and inquiries into her management, interpersonal, and communication skills by her coworkers, supervisors, and subordinates. *Id*. These

9

"360 survey" results would be summarized by more junior officers and were a significant part of the bidding process as it progressed. *Id*.

After bidders submitted their application, regional bureaus would first review the bids and recommend a "short list" to DCM committee (drawn from senior officials, Department-wide) who then designed the final short list for the "selecting official" to review and interview. *Id*. The list would contain five to six qualified candidates, with other applicants falling "below the line." *Id*. at 8. The Chief of Mission was then presented with a list of candidates and made the final call. *Id*. at 6.

After receiving the "360 survey" responses, Heffern informed Ruppe that she fell "below the line" and was taken off the Bureau's proposed short list; the Agency has never provided a consistent objective explanation as to why. *Id*. at 8-9; Dkt. 71-2 at 14. This is troublesome, especially considering Ruppe's qualifications were endorsed by prominent leadership officials such as Ambassador Eric Rubin, who had served on the DCM Committee previously and noted that he would add Ruppe to a tentative DCM short list "[w]ith pleasure." Dkt. 88 at 7-8. Even Assistant Secretary Victoria Nuland, who gave the final approval of all European Bureau recommendations to the DCM Committee and was the selecting official for some posts, could not provide an explanation as to who removed Ruppe's name from the shortlist. *Id*.

10

After falling below the line, Ruppe sent an email to the appropriate officials to withdraw her name from future consideration because "of the potential damage that will likely be inflicted on [her] future career prospects," should she continue. Dkt. 88 at 9. Ruppe emphasized that she withdrew her application to "preempt any prejudicial discussion at the DCM committee meetings." *Id*.

## **ARGUMENT**

### I.    **Standard Of Review**

The United States Court of Appeals for the District of Columbia Circuit reviews grant of summary judgment *de novo*. *Chappell-Johnson v. Powell*, 440 F.3d 484, 487 (D.C. Cir. 2006).

The District Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue as to a material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When evidence or factual issues can "reasonably be resolved in favor of either party," then the matter should proceed to a trial. *Id.* at 250. The court, "should review all of the evidence in the record," *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000), in the light most favorable to the non-moving party, drawing all reasonable

inferences in her favor. *Anderson*, at 255. *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016).

When considering summary judgment, the court is not to render credibility determinations or weigh evidence. *Reeves,* at 150. When the evidence presented on a dispositive issue could be subject to conflicting interpretations, or a reasonable person might differ as to its import, summary judgment is improper. *TSC Industries, Inc. v. Northway, Inc*. 426 U.S. 438, 450 (1976). After examining the record evidence, the court can only award summary judgment when the nonmovant has been unable "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Since it is a "drastic remedy" summary judgment "will only be granted in clear cases." *Greenberg v. Food & Drug Admin.,* 803 F.2d 1213, 1216 (D.C. Cir. 1986) (citation omitted).

## II.    The District Court Erred in Granting Summary Judgment on Ruppe's Non-Selection Claim (Count I)

### A.    The District Court Misapplied the Law by Finding that Ruppe's Withdrawal from Promotion Consideration "Negates" her Discrimination Claim

The District Court misapplied Circuit precedent in finding that there is "no actionable non-selection decision" to be challenged when Ruppe withdrew her bid for the DCM positions. Dkt. 88 at 20. The D.C. Circuit has never held that

withdrawing an application negates Title VII protections as a matter of law, especially when unlawful discrimination was the reason why the application was withdrawn. In holding otherwise, the District Court conflated cases where applicants failed to complete all the necessary components of an application—despite being encouraged to do so by their employers—with Ruppe's decision to withdraw her complete application only because of and after being discriminatorily discouraged from continuing.

The District Court found —as a matter of law —that Title VII plaintiffs cannot proceed with their discrimination claims if they withdraw their name from consideration. Dkt. 88 at 39 (finding that "plaintiff's non-selection for a DCM position was not an adverse action because she withdrew from the position . . ."). For this finding, the District Court first relied on *Burt v. Nat'l Republican Club of Capitol Hill*, 828 F. Supp. 2d 115, 125 (D.D.C. 2011), *aff'd*, 509 F. App'x 1 (D.C. Cir. 2013). The *Burt* court found that an employee did not suffer an adverse employment action to support his non-selection claim because he decided not to complete a test that was "a necessary component of the [job] application process.". *Burt*, at 125-6. In so finding, the court emphasized the fact that the employee's supervisors "individually encouraged [him] to" finish the test, believing that he would be qualified for a promotion if he did so. *Id*. The employee in *Burt* failed to complete the test, not out of fear of discriminatory impact, but because he believed

13

he was too qualified to be subjected to the test. The *Burt* court found that the failure to finish all necessary components of a job application despite encouragement from management to do so could not sustain a claim of discriminatory non-selection. *Id*. at 126. Ruppe's case is readily distinguished from Burt, however. Rather than fail to complete an application despite management's signaling that selection would swiftly follow application, Ruppe completed an application, then withdrew it after and because of management's discriminatory actions removing her from the candidate pool, preventing her selection.

The District Court then relied on another District of Washington D.C. decision in *Lee v. Mabus*, 955 F. Supp. 2d 33 (D.D.C. 2013). In *Lee*, the plaintiff argued that her employer discriminated against her by not promoting her to a grade that matched the additional duties she had taken on. Lee's supervisors informed her that she needed to request "a desk audit" to clarify her current duties before applying for accretion of duties promotion. *Id*. at 39. Lee never requested a desk audit. *Id*. The *Lee* Court did not find that any "failure to complete" an application process negates claim of discrimination, as the District Court found here. *See* Dkt. 88 at 20 ("Plaintiff's withdrawal of her EUR DCM bids constitutes a failure to complete the application process, and that means there is no actionable non-selection decision to be challenged here."). Instead, the *Lee* Court found that the plaintiff had failed to

14

establish, as a matter of fact for that case, that employees like her could obtain promotion without requesting a desk audit first. *Lee* at 43-44.

Therefore, the court reasoned that like *Burt*, the *Lee* plaintiff had failed to finish a necessary component of the application. Here, the District Court improperly applied *Burt* and *Lee* as analogous to Ruppe's situation. However, unlike *Burt* and *Lee*, Ruppe finished her application and took all the necessary steps to present her application to the selection committee. Ruppe did not intentionally and voluntarily fail to meet any necessary components of the application. Not only did Ruppe finish her application, but she only withdrew from further consideration after learning she was effectively disqualified because of discriminatory reasons, another factor that distinguishes this case from *Lee* and *Burt*.

The *Lee* court itself acknowledged that the analysis and result would be different had Lee been "discriminatorily discouraged from requesting a desk audit." *Lee* at 47 n.7. Neither the *Burt* nor *Lee* case relied on by the District Court establish that an employee who withdraws an otherwise complete application because of discriminatory reasons should be barred from proceeding with her Title VII action. Yet here, the District Court incorrectly relied on these two cases in reaching that conclusion. Despite acknowledging that discriminatory reasons did indeed contribute to Ruppe's decision to withdraw her application, unlike the court in *Lee*, the Court never analyzed whether the impact of the discriminatory reasons behind

withdrawing the application should be considered by a jury. *See* Dkt. 88 at 21 (acknowledging Ruppe's statements that Ruppe withdrew her bid to "preempt any prejudicial discussion at the DCM committee meetings."). Unlike the plaintiffs in *Lee* and *Burt*, who were encouraged to complete their applications by their coworkers, here, Ruppe had argued that Ziff's discriminatory statements effectively poisoned the well and sabotaged Ruppe's application, directly contributing to her decision to withdraw.

The District Court's misapplication of the law impermissibly raises the bar for Title VII plaintiffs to clear, as it eliminates legitimate recovery pathways for those who are discouraged from applying to positions or encouraged to withdraw their applications precisely because of the discriminatory conduct at issue. This misapplication of the law, stretching case law beyond its bounds, was a reversible error.

**B.    The District Court Incorrectly Rejected Ruppe's Argument that the Application was Futile**

The District Court also erred in its analysis concerning Ruppe's decision to withdraw from further consideration in another critical respect. There is record evidence that Ruppe's decision to withdraw the application should be viewed as immaterial to her discrimination claim, because her continued application would have been futile. The District Court acknowledged that Ruppe could show that pursuing her application would have been futile. Dkt. 88 at 22. The District Court

16

acknowledged, as it must, that the futility test articulated in *Lathram v. Snow,* is an exception to "the application requirement." 336 F.3d 1085, 1088 (D.C. Cir. 2003). However, as discussed in Section II(A), the "application requirement," to the extent that such a requirement exists, merely requires that Title VII plaintiffs *actually apply* for the position at issue, and not that they never withdraw their application. Here, there is no dispute that Ruppe applied for the DCM roles, and withdrawing from consideration due to discriminatory reasons does not place Ruppe in the same category as the *Lathram* plaintiffs who need exceptions from "the application requirement" because they did not apply at all.

Yet, the District Court found that Ruppe has not provided enough evidence to create a triable issue for the jury on the issue of futility. Dkt. 88 at 22. Ruppe had argued that under the Supreme Court's decision in *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 367 (1977) Ruppe is entitled to relief even when she withdrew her application. Dkt. 71-2 at 17. The *Teamsters* Court found that Title VII applicants are entitled to redress even if they did not apply for the position as long as they can show they were (1) deterred from applying due to their unwillingness to "subject themselves to the humiliation of explicit and certain rejection" resulting from the employer's discriminatory practices; and (2) they would have applied had those practices not existed. *Teamsters* at 365.

17

The District Court below acknowledged the futility exception under *Teamsters*, and reviewed the futility question through a two-part test, demanding that Ruppe show that "(1) her employer['s] policy of 'gross and pervasive' discrimination communicated to a protected class the futility of applying, and (2) that she 'would have applied for the job had it not been for those practices.'" Dkt. 88 at 22 (*citing Carroll v. England*, 321 F. Supp. 2d 48, 67-8 (D.D.C. 2004)). Critically, the Supreme Court's decision in *Teamsters* never imposed such burden in the two-part test. The phrase "gross and pervasive" discrimination only appeared in dicta after the holding in *Teamsters*, to explain one reason why the burden to prove discrimination for applicants who had failed to apply for a certain position should remain low. *Teamsters*, at 367. And as explained below, the D.C. Circuit never adopted language creating such a high bar for Title VII plaintiffs either.

The D.C. Circuit has not interpreted *Teamsters* to require a showing of "gross and pervasive" discrimination at the workplace. The District Court erred in borrowing this incorrect two-part test from the D.D.C decision in *Carroll*. *Carroll* incorrectly heightens the standard the Supreme Court articulated in *Teamsters* and improperly raises the burden for Title VII plaintiffs to establish futility. In *Teamsters* the Supreme Court simply told the trial courts that "[w]hen a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes

18

through the motions of submitting an application." *Id*. at 365-66. Therefore, under *Teamsters*, a jury can decide that Ruppe's withdrew her application solely because she viewed it as futile due to discrimination toward her. This much is evident from Ruppe's own email withdrawing the application, which plainly stated that Ruppe withdrew her application because of her fear "of the potential damage that will likely be inflicted on [her] future career prospects," and to "preempt any prejudicial discussion at the DCM committee meetings." Dkt. 88 at 9.

Instead, the District Court incorrectly found that *Teamsters* required Ruppe to not only convince the jury that "'gross and pervasive' discrimination completely deterred," her application but also other "women in the SFS from applying to the posts . . . ." Dkt. 88 at 22. A reasonable juror could agree that Ruppe's decision to withdraw was due to discriminatory reasons, and it was error to grant summary judgment on this issue when factual disputes on this issue remain unresolved.

Other circuits have also rejected *Carroll*'s incorrect reading of *Teamsters* and the argument that *Teamster*'s futility exception only applies to non-applicants that can show "gross and pervasive" discrimination in all aspects of the employer's hiring practices. *See, e.g., EEOC v. Graceworks Lutheran Servs.*, No. 3:15-CV-261, 2016 WL 3387310, at *4-5 (S.D. Ohio June 15, 2016) (collecting cases from the 6th Circuit). The Court should therefore reverse the District Court's holding that gross or pervasive discrimination in hiring practices is required to establish futility, and

find that Ruppe's application could have been futile given the undisputed evidence that Ruppe's desire for the job was "not translated into a formal application solely because of [her] unwillingness to engage in a futile gesture." *Teamsters*, at 366.

### III.    The District Court Erred in Not Denying the Motion to Amend Answer

The District Court erred in failing to consider years of delay when granting a motion for leave to amend an answer and how prejudicial it was for Ruppe to have to address such a motion during summary judgment briefing. As addressed in more detail below, this issue should have been resolved in her favor, and the District Court's decision was erroneous.

### A.    <u>Amendment of an Answer to Conform to Discovery Evidence Should be Disallowed when Amendment Comes after Summary Judgment Briefing has Begun</u>

The District Court improperly left open the question of whether the Agency could amend its answer over Ruppe's objection while summary briefing was well underway. Dkt. 83. Ruppe pursued diligent and strategic discovery, at great cost and expense, for four and a half years to develop a record and summary judgment posture. Dkt. 81. That posture was based on the Defendant's answer, which included certain admissions. *Id*. Ruppe conducted numerous depositions and exchanged and reviewed over 10,000 pages of material. *Id*. Even prior to the dispositive briefing stage the Court addressed multiple motions, extended time for attempted mediations, and addressed issues of expert witnesses, spoliation and a range of other concerns,

20

and Ruppe's position on all these matters was at all times predicated on the Agency's Answer. *Id*. At the end of this long and arduous road, the Agency arrived at the dispositive briefing stage where the Agency argued that Ruppe's disability discrimination claim must be rejected because Ruppe cannot establish that she was "regarded as" having a "disability" by Ziff. Dkt. 67 at 45-6. There was only one problem. The Agency had admitted that Ziff viewed Ruppe as disabled, and so, Ruppe, in her cross-motion responded to that argument by relying on the admission. Dkt. 71-2 at 48; *see also* Dkt. 12, FAC ¶ 89; Dkt. 13, Answer ¶ 89 (Ziff admitting that he perceived Ruppe as "passive-aggressive" and "paranoid.")). With no way around that admission, the Agency filed its motion for leave to amend the answer and to change this unequivocal admission into a qualified denial. Dkt. 79. Ruppe objected that the motion should be denied as prejudicial because filing of dispositive motions and their opposition should preclude amendments to pleadings. Dkt. 81 at 4.

The District Court's failure to deny the motion for leave to amend the answer ignored the established law around Rule 15 of the Federal Rules of Civil Procedure. The District Court's decision to entertain the potential amendment must factor in prejudice to the nonmoving party and in reviewing a District Court's decision on whether to grant an amendment, the courts of appeal routinely focus their analysis on the prejudice to the non-moving party. *Klunder v. Brown University*, 778 F.3d 24,

34-35 (1st Cir. 2015). The leave to amend should be denied when granting would force the nonmovant into "a likely major alteration in trial strategy and tactics." *Acosta–Mestre v. Hilton Int'l of P.R., Inc.*, 156 F.3d 49, 51 (1st Cir. 1998). By not denying the motion to amend, the District Court left Ruppe in a haze of uncertainty with regards to her dispositive motion and what admissions she was permitted to rely upon.

Summary judgment briefing is the encapsulation and execution of the trial strategy and tactics a party has pursued throughout discovery. For that reason, courts find prejudice to be minimal to the non-moving party "[w]hen amendment is sought shortly after discovery ends but before summary judgment briefing has commenced . . ." *Ponce v. Billington*, 652 F. Supp. 2d 71, 73 (D.D.C. 2009). Here, not only had summary briefing already begun, and not only was the request to amend the answer undoubtably in response to Ruppe's dispositive motion (*see* Dkt. 82 at 2 (defendant conceding that "the timing of the proposed amendment arises from Plaintiff's argument in her summary judgment briefing . . ."), but briefing had largely concluded, with only Ruppe's reply in support of her motion for partial summary judgment remaining. In that reply filing, Ruppe could not, for the first time, present a case against the Agency's now-new position and argument. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (arguments raised for the first time in reply are deemed forfeited). Nonetheless, the District Court's refusal to deny the

22

motion for leave to amend prejudiced Ruppe by shrouding what needed to be responded to in mystery and ambiguity, depriving Ruppe of the chance to fully substantiate its opening brief position in its reply, and diminishing what the District Court viewed as undisputed facts and admission in its final opinion.

**B.**    **Amendment of an Answer to Conform to Discovery Evidence Should be Disallowed when the Only Discovery Evidence Relied on to Amend the Answer is Favorable Deposition Testimony Elicited by the Movant and When Witness's Credibility is at Question**

The District Court should have denied the motion for leave to amend the answer because the Agency's purpose for amending the answer (". . .conforming certain responses to evidence developed during discovery."), Dkt. 79 at 1-2, did not fall under what Fed. R. Civ. P. 15(b)(2) envisions as conforming the pleading to evidence. That rule provides that "[w]hen an issue not raised by the pleadings," but is otherwise "tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2). In such case, "a party may move—at any time, even after judgment" to amend the pleadings to conform them "to the evidence and to raise an unpleaded issue." *Id*. Rule15(b)(2)'s reference to "an unpleaded issue" signals that the courts should be lenient in allowing amendments to match the pleading to the parties' trial posture with regards to issues that are effectively being tried while not being mentioned in the pleadings at all. Rather than conform to this requirement, the court deferred resolution on this critical

issue, despite the issue being admitted for years. Dkt. 12 at 14, FAC ¶ 89; Dkt. 13 at 10, Answer ¶ 89.

Unlike the conformity requirement of Rule15(b)(2), here the defendant attempted to change its position on a pleaded issue, and only to conform its position to favorable testimony that party had elicited from its own witness to rebut the admission in the answer. Dkt. 82 at 2 (arguing that amending the answer was necessary to conform the evidence to "sworn testimony of witness" later obtained in discovery). Rule15(b)'s language only anticipates leniency in conforming pleadings to evidence when the underlying evidence is newly introduced to the moving party after filing the answer, and not when the underlying evidence was in the possession of the moving party's own witness and therefore should have been known earlier. Allowing amendment of answers in such scenarios would render any admissions in the answer a nullity, as the defendants would always have the chance to revisit the admissions by eliciting contradictory testimony from their own witnesses later.

## IV.   A Reasonable Juror could Agree that Agency's Denial of Performance Pay to Ruppe was Discriminatory (Count II).

The District Court's decision regarding the Agency's 2016 denial of performance pay to Ruppe was erroneous because the record evidence, viewed in the light most favorable to Ruppe, did not establish the legitimate, non-discriminatory reasons for the decision. Instead, the Agency supplied a previously undisclosed declaration by a previously undisclosed witness, Lisa Vickers, to justify

24

the decision. Dkt. 88 at 10 n.10. This declaration refers to a report that purportedly included a force ranked list of SFS Officers who received performance pay. Notably, the report was not included, nor were the reasons for the board's decision. Ms. Ruppe correctly objected to this report and the belated disclosure. Dkt. 71-1, at 10 ¶ 53. Ms. Vicker's declaration, and the undisclosed report, is not sufficient evidence to prove the actual reasons Ruppe was denied performance pay for legitimate and non-discriminatory reasons. Dkt. 71-3 at 118-124 (PEX 18). The actual reasons for the Agency's denial of performance pay remain unclear and disputed.[2]

But the belated disclosure of material information is not the only fatal flaw in the Agency's argument that its decision to deny performance pay to Ruppe was nondiscriminatory and not actionable. The Agency's argument is also a tautology. In sum, the Agency decided Ruppe did not qualify for performance pay because a board said so. Dkt. 78 at 22, Dkt. 71-3 at 118-124. The Agency never actually explained its reasoning in detail. Thus, the Agency's position that Ruppe's stellar performance and supervisor's nomination for the performance pay were not sufficient to earn

---

[2] Under binding precedents, the Agency's asymmetrical access to this information and failure to disclose it cannot be ignored. As the D.C. Circuit has noted, "…the employer will always have the relevant records in its possession. Moreover, even if an employee executes the perfect discovery strategy, a vague and slippery explanation may still confuse the issues and prevent the employee from presenting a clean case at trial. *See EEOC v. Flasher Co.*, 986 F.2d 1312, 1318 (10th Cir. 1992) (noting that when employers fail to give a proper explanation "at the outset," litigations become "needlessly confused and delayed"). *Figueroa v. Pompeo*, 923 F.3d 1078, 1094 (D.C. Cir. 2019).

performance pay, which the Agency offers without any specific explanation, is unsupported with admissible record evidence. Dkt. 71-2 at 21-22. The Agency's proffered affidavit from a previously undisclosed witness, based on an undisclosed report, is not sufficient as a matter of law to dismiss Ruppe's performance pay allegations, which must go to a jury.[3] Dkt. 85 at 19-20.

## V.   The Court Erred when it transferred Ruppe's EPA claims to the Court of Federal Claims (Count III)

### A.   The District Court Can Retain Jurisdiction over the Equal Pay Act Claim under *United States v. Bormes*

The District Court's decision that it lacks jurisdiction over Ruppe's equal pay act claim conflicts with the Supreme Court's decision in *United States v. Bormes*, 568 U.S. 6, 19 (2012). In finding that the equal pay act claims should be transferred to the Court of Federal Claims, the District Court relied on *Waters v. Rumsfeld*, 320 F.3d 265, 270-72 (D.C. Cir. 2003). *Waters* held that jurisdiction to entertain Equal Pay Act claims under the Fair Labor Standards Act are governed by the Tucker Act. *Id*. After *Waters*, however, the Supreme Court acknowledged in *Bormes* that under

---

[3] Other courts have denied summary judgment when a reasonable juror could believe the Plaintiff's allegations. *See for e.g., Smith v. Blinken*, No. 1:18-CV-03065 (CJN), 2021 WL 3737455, at *9 (D.D.C. Aug. 24, 2021) ("Because a reasonable juror could find, based on the present record, that Ms. Smith suffered discrimination on the basis of national origin and that she was subjected to a hostile work environment on the basis of her sex and her engagement in protected activity, it would be inappropriate to grant the pending Motion for Summary Judgment.")

the Supreme Court's recent authority "statutory schemes with their own remedial framework exclude alternative relief under the general terms of the Tucker Act." *Bormes,* at 15. Applying that logic in *Bormes*, the Court found that the Fair Credit Reporting Act ("FCRA"), for example, displaced the Court of Federal Claims' Tucker Act jurisdiction because FCRA had its own remedial framework, providing that actions may be brought "in any appropriate United States district court, without regard to the amount in controversy, <u>or in any other court of competent jurisdiction</u>." (emphasis added). *Id*. The FLSA includes a similar provision, providing that an FLSA action can be brought "in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216. Therefore, like FCRA, the FLSA's text displaces Tucker Act jurisdiction.

While the District Court relied on the D.C. Circuit's decision in *Waters* which held that Equal Pay Act claims in excess of $10,000 fall within the "exclusive jurisdiction" of the Court of Federal Claims, *Waters* did not involve a textual analysis of FLSA's jurisdictional provision above, and instead only addressed whether or not there was a clear and adequate expression of an intent to waive damages in excess of $10,000 in that case. *Waters*, at 271 (noting that the issue on appeal was whether the court's exercise of jurisdiction was in line with waiver of damages amounts in excess of $10,000). Because *Waters*' analysis was limited to that case-specific

question, the D.C. Circuit did not address the text of the jurisdictional provision above as required by *Bormes*. *See Bormes*, at 15 (finding that "only [FCRA's] *own text* can determine whether" FCRA can operate without resort to the Tucker Act). Neither did *Waters* address D.C. Circuit's own precedent, including *Ososky v. Wick*, where the D.C. Circuit reviewed the merits of EPA claims for plaintiffs with identical profiles to Ruppe and found that the EPA applies to the Foreign Service. *Ososky,* 704 F.2d 1264, 1268 (D.C. Cir. 1983). Because the District Court's decision to transfer the EPA claims contradicts with *Bormes* and D.C. Circuit's precedent in reviewing merits of EPA claims, the Court should reverse the transfer order.

The District Court also incorrectly characterized the transfer as being one agreed to by the parties. Dkt. 88 at 28 n.20. But this is not accurate. The Agency stated in a footnote, "While the United States continues to maintain that post-*Bormes* FLSA damages claims, including those seeking more than $10,000, should be heard in District Court, the Federal Circuit and judges in this District have declined to adopt that position." *See* Dkt. 67 at 29 n.7 (citing to *Abbey v. United States*, 745 F.3d 1363, 1369 (Fed. Cir. 2014); *Dreiband v. Nielsen*, 319 F. Supp. 3d 314, 323 (D.D.C. 2018); *Johnson v. Lightfoot*, 273 F. Supp. 3d 278, 287-88, n.5 (D.D.C. 2017); *Adair v. Bureau of Customs & Border Prot.*, 191 F. Supp. 3d 129, 133 (D.D.C. 2016). Ruppe consistently argued that her EPA claim should remain before the District Court. Any fair reading of these arguments shows the parties indeed wished to

remain before the District Court, and articulated grounds for their positions in their papers.

## VI. Administrative Exhaustion did not Bar Ruppe's Disparate Impact Claim (Count IV)

### A.   An EEO Formal Complaint Was Sufficient to support Ruppe's Allegations of Disparate Impact

The District Court incorrectly found that Ruppe's January 3, 2017, formal EEO complaint did not include a disparate impact claim or identify any departmental pay practice that had a discriminatory impact on women. Dkt. 88 at 29-30. The exhaustion requirements under Title VII are mandatory but not jurisdictional. *See Douglas v. Donovan*, 559 F.3d 549, 556 n.4 (D.C. Cir. 2009). Therefore, in the D.C. Circuit, when exhaustion is raised as an affirmative defense, the EEOC complaints are to be "construed liberally." *See Shehadeh v. Chesapeake & Potomac Tel. Co. of Md.*, 595 F.2d 711, 727 (D.C. Cir. 1978). The courts therefore often examine other documents such as supporting affidavits as well in deciding the scope of the claim that was raised before the EEOC. *See, e.g., Josephs v. Pac. Bell*, 443 F.3d 1050 (9th Cir. 2006) (evaluating affidavits supporting EEO complaint as part of exhaustion analysis); *see also Marshall v. Federal Exp. Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (reviewing allegations in supporting affidavits for exhaustion purposes); *Crawford v. Duke*, 867 F.3d 103, 107–08 (D.C. Cir. 2017) ("Attachments to a formal EEO complaint are an

29

integral part of the complaint and can independently identify claims for resolution.").

Here, the District Court did not follow the binding precedents on this issue. Specifically, the District Court failed to construe the underlying record liberally and ignored aspects of Ruppe's administrative claim that gave the Agency adequate notice that Ruppe was raising a disparate impact claim. For example, the District Court incorrectly found that "[w]hile the EEOC complaint alleges that plaintiff was underpaid for her position in relation to her Equal Pay Act claim, the allegations deal solely with plaintiff's individual situation," Dkt. 88 at 31, even though Ruppe's administrative complaint did not just state that she was underpaid but that she was underpaid "by up to $25,000 per year *under State Department guidelines*," implying that all employers in her situation would be underpaid for the same reason. Dkt. 67-2 at 184. The administrative complaint also explicitly referred to "the State Department's unique pay scale," as the basis of Ruppe's pay claim. *Id*. at 182. Challenging the State Department's pay guidelines by definition expanded Ruppe's claim beyond solely her own "individual situation." Similarly, Ruppe's administrative complaint described the relief sought as "[b]ack pay for pay commensurate *with her fellow employees at her leave*," another clear sign that Ruppe was notifying the Agency of a disparate impact claim that applied to many employees beyond just Ruppe. *Id*. at 184 (emphasis added*)*.

30

The District Court also ignored the weight of other supporting affidavits in finding that "there was no mention of employment practices that had an alleged disparate impact on women in the EEO complaint that would have notified the Agency of the need to look into them." Dkt. 88 at 31. In fact, the underlying record included an affidavit from the Department's HR representative, that expressly discussed the employment practices and policies that had the alleged disparate impact on women, referring to them as "the pay setting policy". *See* Dkt.71-2 at 20 n.5. *See also* Dkt. 72 at 8-13 (PEX 4, Filed under seal), Dkt. 85-4 at 6. The District Court's failure to address this conflicting evidence, or weigh it in the light most favorable to Ruppe, was error.

The Agency's invocation of exhaustion at this stage of the case is highly problematic for other reasons. The purpose of administrative exhaustion is to place the defendant Agency on notice of employee's claims early in the process, so resolution may be possible. Ms. Ruppe identified discrimination based on pay disparity in her Formal Complaint of discrimination. Dkt. 67-2 at 182-84. The evidence that Ruppe was paid less than her male counterparts, was corroborated by record evidence from the Defendant's own documents. From the Defendant's own discovery productions, Ruppe found proof she was underpaid as compared to male employees and submitted charts substantiating her claims (*See for e.g.* Dkt. 71-2 at 23; Dkt. 71-3 at 118-24 (PEX 18). Thus, the Defendant had access to Ms. Ruppe's

31

claims, and the evidence related to them, throughout the entire process. In *Fort Bend County, Texas v. Davis*, the Supreme Court clarified that the administrative exhaustion requirement is a claim-processing rule, not a jurisdictional one. 587 U.S. 541, 545 (2019). Lack of administrative exhaustion is an affirmative defense which can be waived. The Defendant's own discovery productions substantiated Ruppe's claims, but now the Agency asserts exhaustion, and claims to lack sufficient notice of her claims. Ruppe relies on information which was available to the Defendant all along, the Agency was aware of its own policies, and the Agency has failed to raise exhaustion "promptly" as required by *Davis. Id.* at 552.

The application of the exhaustion doctrine is useful when reviewing the merits of the claim "would circumvent the EEOC's investigatory and conciliatory role," or when it would "deprive the charged party of notice of the charge." *Marshall*, 130 F.3d at 1098. Neither problem is present here, as the underlying record indicates that the parties investigated the precise employment practice and policy that had disparate impact, and the Agency had every "opportunity to resolve [the] claim administratively before [the employee] file[s] her complaint in district court.'" *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010). Therefore, the District Court was incorrect to find that the EEO proceeding did not cover Ruppe's allegations of disparate impact or that the application of the exhaustion doctrine was appropriate.

32

**B.**    **Ruppe's Disparate Impact Claims are "Like or Reasonably Related to" Her Allegations in the EEO Complaint**

The District Court also held that Ruppe's disparate impact claims are barred for failure to exhaust administrative remedies because they are not sufficiently related to her disparate treatment claim. Dkt. 88 at 29. Ruppe argued that the administrative complaint does not necessarily need to set out "the identical legal claims or precise allegations that the employee intends to pursue before the District Court," so long as like or reasonably related claims give the Agency enough notice of the unlawful practices under investigation, (Dkt. 71-2 at40), but the District Court rejected that argument.

As the D.C. Circuit articulated in *Park v. Howard Univ.*, 71 F.3d 904 (D.C. Cir. 1995) Title VII claims that, although not precisely articulated in the administrative complaint, nonetheless "arise from the administrative investigation that can reasonably be expected to follow" the administrative complaint have put the Agency on adequate notice, and as such, district courts can review the merits of those related claims after the administrative investigation. *Id*. at 907 (*citing Chisholm v. United States Postal Service*, 665 F.2d 482, 491 (4th Cir.1981)); *see also Hazel v. WMATA*, No. 02–1375, 2006 WL 3623693, at *7 (D.D.C. Dec. 4, 2006) (finding that claims of ongoing retaliatory activity first articulated in the amended complaint are "of a kind similar to that alleged in [the] initial charge" and are therefore adequately

33

raised). Evaluation of these precedents in light of the record evidence shows the District Court's analysis was flawed and must be reversed.

Here, the administrative proceeding below was reasonably expected to delve into the Department's neutral policies that Ruppe claims have disparate impact on women. The parties do not dispute, and the District Court acknowledged, that the EEOC Complaint included a claim for disparate treatment. Dkt. 88 at 30. A disparate impact claim investigation is expected to naturally grow out of disparate treatment claim when the EEOC complaint makes reference to allegations of other similarly situated employees being harmed as well by the facially neutral policies. For this reason, the courts have held that when plaintiffs allege in their EEOC charges that they and other similarly situated individuals were treated worse than other workers because of their race (a disparate treatment claim), an investigation into these claims could naturally be expected to consider the defendant's employment policies on race as well. *See Rollins v. Traylor Bros., Inc.*, 2016 WL 258523 at *14 (W.D. Wash. Jan. 21, 2016) (finding that while an investigation of a *disparate impact* claim would not necessarily "encompass" a subsequent claim of disparate treatment, an investigation of a disparate treatment claim is likely to encompass a claim of disparate impact).

Other federal courts have found plaintiffs who articulate claims of discrimination, and adequately referenced the policies at issue in general, to proceed with their cases. In a situation similar to Ruppe's, when plaintiffs have broadly

34

referenced facially neutral policies in their EEOC charges, such as claiming that their reduction in salary was "in accordance with the Department['s] Compensation Plan," or that their salary calculation was based on "a 'newly proposed methodology for salary-setting' " at the place of their employment, certain courts have found such charges to identify "a specific employment policy," which opens the door for a disparate impact claim. *See Leykum v. U. of Texas Health Sci. Cent.*, 2021 WL 12310746 at *2 (W.D. Tx. Nov. 22, 2021). Ruppe's EEOC claim also made references to the Department's "unique pay scale." Dkt. 67-2 at 182. It asserted that Ruppe's "reduced pay" is part of the Department's whole "work environment." *Id.* at 184. And it sought recovery commensurate with Ruppe's "fellow employees." *Id.* Others involved in the administrative investigation acknowledged that the claim challenged "the pay setting policy." Dkt. 71-2 at 20. In line with Ruppe's references, that similarly-situated employees were being harmed by facially neutral policies, and that they would also be entitled to damages, the parties also *actually* investigated department-wide policies. Therefore, the District Court should have found that a disparate-impact investigation could reasonably be expected to grow out of the disparate treatment allegations in the administrative complaint and should have reviewed those claims. *See Houle v. Walmart Inc.*, 447 F. Supp. 3d 261, 277 (M.D. Pa. 2020) (finding that "even though plaintiffs did not cite a specific pay policy, a reasonable EEOC investigation of a disparate impact claim could grow out of [their]

charges" because "charges describing pay discrimination could fairly be read to allege disparate treatment and disparate impact."). Notably, none of the cases from the District Court's Opinion addressing this issue state that disparate treatment and disparate impact claims are separate as a matter of law. Dkt. 88 at 30.

## VII. The Court Improperly Granted Summary Judgment on Ruppe's Retaliation Claim

### A.  <u>A Reasonable Jury Could Have Found that Ruppe was Retaliated Against for Expressing Opposition to Unlawful Title VII Practices</u>

The District Court found that Ruppe's allegations of work misconduct did not qualify as statutorily-protected activity. Dkt. 88 at 33. In doing so, the District Court specifically rejected the claim that Ruppe's communications with the Ombudsman's Office and the climate survey she animated could constitute protected activity under Title VII. The District Court noted that Ruppe's reporting was not protected activity because it covered personnel grievance that did not raise to the level of opposition and "particularly" did not qualify because "they were raised with the office that the parties have agreed has no EEO responsibilities." *Id*. The District Court's finding improperly raised the bar for what qualifies as protected activity under Title VII.

The D.C. Circuit has not held that the allegations must be reported to an office that has formal EEO responsibilities in order to constitute protected activity. As the Second Circuit has noted, Title VII protects "employees in the filing of formal charges of discrimination as well as in the making of informal protests of

36

discrimination," including even "making complaints to the management." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2nd Cir. 1990). Citing favorably this Second Circuit's approach to reviewing informal misconduct reporting, the D.C. Circuit has held that "opposition" activity under Title VII should be construed "broadly" as "including virtually any open allegation of discriminatory behavior." *See Beeck v. Federal Exp. Corp.*, 81 F.Supp.2d 48, 55 (D.C. Cir. 2000). Under this standard, the D.C. Circuit has found that an informal letter to an employer alleging a discriminatory act is sufficient to constitute opposition, *Paquin v. Federal Nat. Mortg. Ass'n*, 119 F.3d 23, 32 (D.C. Cir. 1997), as is "making complaints to management" or "writing critical letters to customers," *Beeck*, at 55 (citing *Sumner*, at 209), or even "protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges[.]" *Id*. Whether or not the office that receives the internal complaints has EEOC responsibility is rarely material to the real inquiry which is whether the employee seeking the protection of the opposition clause "demonstrate[d] a good faith, reasonable belief that the challenged practice violate[d] Title VII." *Parker v. Balt. & O. R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981).

Here, Ruppe reported her concerns to the Department's Office of the Ombudsman. That office's mission is to serve as a resource to "identify and resolve workplace conflicts or workplace issues." Dkt. 67-2 at 445; Dkt. 67-2 at 260-273;

Dkt. 88 at 3 n.2. Ruppe also expressed her opposition to the workplace misconduct in the Ombudsman's "climate survey," which designed to identify concerns with the workplace. Dkt. 67-2 at 446-48. While this office has no EEO responsibilities, its status is no different than other employee assistance offices that work to resolve grievances associated with protected activity. For example, in *Rattigan v. Gonzales*, 503 F. Supp 2d 56 (D.D.C. 2007), the plaintiff reported his concerns about racial discrimination to the FBI's Employee Assistance Program ("EAP") with no EEOC responsibilities. As the *Rattigan* court found, the fact that EAP services did not amount to EEOC counseling was immaterial because "opposition to an unlawful employment practice" qualifies as protected activity even if it may have occurred outside of the EEO context. *Id*. n.7 (citing *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)). A reasonable jury could have found that Ruppe's communications with the Ombudsman's Office and her supervisors were reflective of a "good faith, reasonable belief" that the employer misconduct she was challenging was a violation of Title VII. By raising the legal standard for showing prima facie evidence of protected activity and demanding that Ruppe shows communications with an office with EEO responsibilities, the District Court took this determination away from the jury.

**B.    The Temporal Proximity between Ruppe's Activity and the Retaliatory Acts Supported an Inference of Causation**

The District Court also found that even if Ruppe had engaged in protected activity, there was no evidence that her protected activity caused an adverse action. Dkt. 88 at 34. While as a matter of law temporal proximity between protected activity and adverse action could by itself support an inference of retaliation, the District Court found that this exception should apply when the two events are "generally, just a few months apart," a condition the District Court found not applicable in this case. *Id*. For this finding the District Court relied on *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001), and noted that there, the Court cited approvingly other cases where three- and four-month intervals were found insufficient for causality inference.

The Court's reading of *Clark* and its progeny misapplies the law by imposing a bright-line rule on a fact-intensive question that should be reviewed by the jury. As the D.C. Circuit has held, neither the Supreme Court's decision in *Clark* nor any D.C. Circuit precedent "has established a bright-line three-month rule" for temporal proximity. *Hamilton v. Geithner*, 666 F.3d 1344, 1357-58 (D.C. Cir. 2012). *Clark* only held that in most cases twenty months between protected activity and alleged retaliation "suggests, *by itself*, no causality at all." *Clark*, at 273-74 (emphasis added). Leaving aside the difference that here, Ruppe is not just relying on temporal

proximity alone to establish causation, the time gap between the protected activity and the adverse employment in this case is not twenty months.

The D.C. Circuit has required that the courts "evaluate[] the specific facts of each case" to determine whether temporal proximity implies retaliation and avoid a hardline application. *Hamilton* at 1357-58. In fact, when plaintiffs have engaged in series of repeated actions that could be viewed as protected activity, mostly in instances like this case where the issue between Ruppe and her supervisors was of an ongoing nature, the D.C. Circuit has even held that an adverse action that occurred "years after the initial filing of charges" can still support an inference of retaliation so long as it was closed to the last protected activity. *See Jones v. Bernanke*, 557 F.3d 670, 680 (D.C. Cir. 2009); *see also Singletary v. Dist. Of Columbia*, 351 F.3d 519, 524 (D.C. Cir. 2003) (finding error where "[i]n concluding that there was insufficient temporal proximity between the defendants' alleged retaliatory actions and Singletary's protected activity, the District Court failed to take account of protected activity that Singletary undertook long after the original protected activity.").

Based on these precedents, Plaintiffs like Ruppe are entitled to a fact-intensive analysis of temporal proximity between various protected activities and the retaliatory act by a jury. *See Jones*, at 769 (finding that "*Clark County School District v. Breeden* does not weaken any inference of retaliation *that a reasonable jury could draw* from the temporal connection between Jones's protected activity and his

subsequent adverse evaluation.") (emphasis added); *see Roman v. Castro*, 149 F.Supp.3d 157, 173–74 (D.D.C. 2016) (finding that a reasonable jury could discern retaliation based on the combination of temporal proximity and a "budding pattern of antagonism" related to the plaintiff's prior protected activity). The District Court's cursory and incorrect review of the facts in this case cannot substitute for the fact intensive analysis that the D.C. Circuit has endorsed.

The District Court made a cursory and hasty conclusion that since Ruppe submitted the climate survey in July of 2015 and since the allegedly retaliatory conduct occurred "the following year",there is absence of temporal proximity. (Dkt. 88 at 34). The trial court's haphazard and incomplete review of the facts ignored, for example, that a reasonable jury could find that Ruppe's protected activities continued beyond July 2015. (Dkt. 71-1 at 9, Def.'s SOF ¶¶ 44, 45 (Ruppe's continued protestations about her male deputies after July 2015). In reality, the timeline between Ruppe's last acts of protected activity and the adverse action was somewhere around 11 months or shorter. Therefore, a reasonable juror could consider the temporal proximity of 11 months as evidence of retaliation under relevant law. Such a conclusion would be permitted as 11 months falls squarely in between the amount of time the District Court stated courts usually accept the inference of retaliation as a matter of law (three months) and the amount of time the District Court thought courts usually do not accept, as a matter of law (20 months).

41

Accordingly, a jury should evaluate the temporal nexus between Ruppe's alleged protected activities and the retaliatory acts, to determine if there was retaliation. Given the inadequacy of the District Court's retaliation findings addressed above, similar defects in the remaining counts are addressed below.

## VIII. The Court Improperly Granted Summary Judgment on Ruppe's Hostile Work Environment Claim

To successfully establish a hostile work environment claim, Ruppe had to show that the totality of circumstances show that Ruppe's workplace was both objectively and subjectively offensive. *Allen v. Napolitano*, 774 F. Supp. 2d 186, 205 (D.D.C. 2011). While Ruppe presented sufficient factual evidence that the discriminatory conduct in her workplace was frequent, severe, offensive, and interfered with her work, the District Court did not seriously evaluate whether the alleged conduct was objectively offensive. Instead, the District Court chalked these allegations off as "snide remarks and armchair psychology" by Ruppe's supervisors. Dkt. 88 at 36. The District Court's cursory treatment of the allegations improperly invaded the province of the jury where a reasonable jury could have indeed found the facts to be enough to establish a hostile work environment.

Ruppe was incessantly subjected to a barrage of sexist treatment in her office. Her supervisors did not shy away from using discriminatory language against her, including repeatedly labeling her as "passive-aggressive" and a "micromanager."

Dkt. 71-2 at 10.[4] Ziff told Ruppe "to stop working, to go sit in [her] office and do nothing." *Id.* at 45. Ziff developed an overtly negative view of Ruppe, her qualifications, her aspirations, and her potential, which he considered permanently tied to where Ruppe's "husband live[ed]." *Id.* at 46. Even beyond what was specifically directed at Ruppe routinely, Ruppe identified sexist attitudes directed at others, including subordinates, and permeating the whole work environment. This included off-color remarks, with Ziff feeling impunity to discuss "human secretions" in response to coworker's return from maternity leave. Dkt. 88 at 37. Ruppe's supervisors promoted a workplace vocabulary that endorsed sexist phrases such as "bridesmaids" for workers who were not promoted and "meat markets" to refer to meeting to deconflict personnel assignments. Dkt. 88 at 37. Ruppe provided sufficient evidence that there was pervasive use of language and conduct such to create a hostile work environment. Dkt. 85-6.

As the Supreme Court noted in *Harris v. Forklift Systems, Inc.*, the "especially egregious examples of harassment," do not "mark the boundary of what is actionable," under Title VII, yet the District Court's analysis of these facts, and diminishment of Ruppe's claims, contradicts this binding precedent. 510 U.S. 17, 22 (1993). The Supreme Court case law does not require a showing of especially

---

[4] *See* Dkt. 85-6 at 5-6.

egregious conduct before allowing a jury to assess the hostility of work environment. The District Court cited to a series of cases to conclude that the behavior Ruppe subjected to merely represents "teasing" or "petty insults" and not more pervasive sexist attitudes. Dkt. 88 at 37. This finding improperly invaded the province of what a jury should decide. Under relevant law, what the words and the actions represented is a question that the jury should decide and not the court. *See, e.g., Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 260 (5th Cir. 2011) (affirming the jury's verdict in favor of a female sexual-harassment plaintiff who introduced evidence that decision-makers made sex-based comments—that "women [are] a detriment to the company," women "get hired on, get married, and/or get pregnant and they leave," and that the plaintiff did not need to worry about her sales quota because "it shouldn't matter to you, you're not the breadwinner anyway").

Other courts examining the nature of discriminatory comments and actions have concurred such matters are best left for a jury to consider. In *Conway v. Principi* for example, the plaintiff alleged the "appearance of hangman's nooses" in his workplace created a racially hostile work environment because of the associated undertones with such an object. 2005 WL 2230294 (N.D. W.V. Sept. 13, 2005). When defendants questioned the plaintiff's subjective assessments and alleged that the noose-like knots were not intended to represent the racist symbol, the court correctly found that the question of what meaning should be assigned to the symbol

44

is best resolved by a jury. *Id*. In that case, the jury had the opportunity to hear several witnesses who shared their perception of the noose, its significance in the particular workplace environment, what feeling it evoked, and the context of its appearance. *Id*. at *3. Such disputed factual issues are not resolvable as a matter of law.

Ruppe's case presented a similar dynamic to *Principi* and should also be evaluated by a jury for similar reasons. The District Court's acknowledgement that Ruppe's allegations of misconduct did in fact occur should have entitled Ruppe to a jury's assessment of the weight and meaning of the misconduct. In fact, by denying Ruppe that opportunity, and minimizing the significance of the series of illicit acts Ruppe had identified, the District Court completely ignored the witness testimony that a jury could have found persuasive. As in *Principi*, the repeatedly sexist comments of her supervisor, the gendered language, and conduct did indeed reflect pervasive sexist behavior. Far from reflecting only Ruppe's impressions, Townsend had also testified that Ziff's remarks were "inappropriate in a number of ways." Dkt. 88 at 4 n.3. Nuland had also substantiated that the workplace's vocabulary was riddled with phrases that "probably should be expunged in the 21st century." Dkt. 71-2 at 47. Therefore, the jury could have been, and should have been, allowed to evaluate the evidence supporting Ruppe's claims of hostile work environment to determine if the actions created an objectively hostile work environment. The Court's grant of summary judgment on that issue should be reversed.

## IX.    Ruppe Successfully Showed that she was Discriminated Against in Violation of the Rehabilitation Act

The District Court's erroneous ruling on Ruppe's disability discrimination claim flowed naturally from the court's failure to acknowledge the admissions the defendant made about Ruppe's disability as discussed in Section II. While the District Court notes that Ruppe "alleges that Ziff perceived plaintiff as having 'passive-aggressive disorder and paranoid personality disorder,'" Dkt. 88 at 38, this was not an allegation but an admission on the record, leaving no doubt that Ruppe's supervisors regarded her as having an impairment. 42 U.S.C. § 12102(1). Therefore, Ruppe has met the first element of establishing a Rehabilitation Act claim—namely that adverse actions could be attributed to her employer's perception of her as having a disability. Because the District Court also incorrectly held that Ruppe's non-selection for the DCM position was not an adverse action (solely because Ruppe withdrew from the position), if the Court reverses that finding, *see* Section II(B), the Court should find that Ruppe has successfully established both elements of the Rehabilitation Act claim.

But even if the Court does not find that Ruppe's application withdrawal was an adverse action, this Court should remand the case so that a jury can determine if there was causal connection between Ziff's perception of Ruppe as having a disability and Ruppe's denial of performance pay and non-selection. In finding that there was no adverse action that can be traced to Ziff's perceptions of Ruppe's

46

disability, the District Court held that Ruppe "has not come forward with any evidence to show that Ziff used psychological terms in describing her to any of the relevant decision makers or that any of them were even aware that he referred to plaintiff in that manner," and therefore there was no "genuine question for the jury as to whether [Ruppe] suffered an adverse employment action because of Ziff's supposed perception." Dkt. 88 at 40. The District Court's finding ignored Ruppe's evidence of proximate causation under the "cat's paw" theory of causation.

An employer cannot "effectively shield[]" itself from liability for "discriminatory acts and recommendations of supervisors that were designed and intended to produce the adverse action" merely by "isolat[ing] a personnel official" from those supervisors. *Staub v. Proctor Hospital*, 562 U.S. 411, 419 (2011). Therefore, when a seemingly "neutral decisionmaker" relies on supervisor's wrongdoing, proximate causation is still met under the cat's paw theory. *Roman v. Castro*, 149 F.Supp.3d 157, 173 (D.D.C. 2016) (citing *Staub* at 415). Such causation "is normally a question of fact to be decided by the jury," *Payne v. District of Columbia*, 741 F. Supp. 2d 196, 219 (D.D.C. 2010), *aff'd*, 722 F.3d 345 (D.C. Cir. 2013), and the party opposing summary judgment can provide evidence of "a direct or indirect nature" from which a reasonable jury could infer the causal link. *Williams v. Johnson*, 701 F.Supp.2d 1, 17 (D.D.C. 2010). A reasonable jury, drawing all reasonable inferences in Ruppe's favor, could not return a verdict for the defendant

and therefore the Agency was not entitled to summary judgment. *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015) (finding that a movant is entitled to summary judgment only "when the evidence is such that a reasonable jury, drawing all reasonable inferences in the non-movant's favor, could not return a verdict for the non-movant.").

Ruppe presented adequate evidence for a reasonable jury to conclude that Ruppe's supervisors were effectively shielding defendant from liability by isolating themselves from the adverse decisions that they had indeed influenced. Ruppe was fully qualified for a DCM position, and performance pay, and identified Ziff's public disparagement of her as the precise turning point in her viability for those benefits. (Dkt. 71-2 at 49-51). Ziff had directly responded to Ruppe's disclosures by excluding her from office meetings, and he had informed Ruppe that she was difficult to work with, demanding that she stay in her office. (Dkt. 71-2 at 10). Ziff and Heffern (her second line supervisor) had direct involvement in the consideration of Ruppe's candidacy for the DCM positions, and appear to have influenced the selection panels with unspecified, vague, and arbitrary concerns about Ruppe. *Id*. Those involved in the coworker "360 survey" of Ruppe's qualifications parroted Ziff's disparaging characterizations of Ruppe's management style. Dkt. 88 at 7. Ruppe also provided indirect evidence showing that the selecting officials prevaricated and shifted their explanations concerning how, why and when, Ruppe was removed from

consideration for the DCM positions. (Dkt.71-2 at 14). The Agency failed to provide a clear and non-discriminatory reason for her removal from the short list, and their own witnesses could not agree on who decided to take that action, or why.

Despite the conflicting witness testimony on the reasons for Ruppe's non-selection, the District Court's was prematurely dismissive in its analysis of Ruppe's cat's paw theory. In particular, it rejected such a theory because "Ziff did not remove plaintiff's name from any EUR DCM short list," and because Ziff did not even hold decision-making authority over the EUR short lists," facts that are irrelevant to the cat's paw theory analysis which focuses on whether the supervisors *influenced* the adverse action *despite* not being the ultimate decisionmaker themselves. Dkt. 88 at 23 n.19. In reviewing the evidence behind "cat's paw" theory of causation, the District Court also failed to acknowledge that employees can cast doubt on the employer's proffered reasons for the adverse personnel action by pointing to "changes and inconsistencies in the stated reasons for the adverse action," among others. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 n.3 (D.C. Cir. 2008). And Ruppe outlined a myriad of changes and inconsistencies from which a reasonable jury could have found causation: during sworn deposition, Heffren's explanation for why the Committee did not advance Ruppe's candidacy contradicted his affidavit during the underlying EEO investigation. Dkt. 71-2 at 14. Indeed, the contradictions in witness testimony on this critical point are irreconcilable.

49

While all three officials were involved in the shortlist process, Ziff, Nuland, and Heffern each had distinct, and inconsistent, explanations for why Ruppe was removed from consideration. *Id*. The District Court simply did not resolve these discrepancies. Nor did the District Court address why, drawing all inferences Ruppe's favor, the record evidence established that Ruppe's supervisor (Ziff) had not influenced the process. Based on the inconsistent testimony from Ziff, Nuland and Heffer, it appears these witnesses were shielding themselves from liability by distancing themselves from the ultimate decision. This is particularly glaring because these individuals were "the sole source of nearly all the pertinent information" about Ruppe's qualifications, and, in such cases it is reasonable to assume that the supervisor's baseless denials do not eliminate the possibility that they likely influenced the decision. *See for e.g., Schandelmeier-Bartels v. Chicago Park Dist*. 634 F.3d 372, 381 (7th Cir. 2011) (finding that in cat's paw theory analysis "interoperating conflicting evidence in favor of the plaintiff," that the supervisor who was "the sole source of nearly all the pertinent information" about the employee influenced the adverse action that required taking into account that information); *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 486 (10th Cir. 2006) (noting that the cat's paw theory is intended to "foreclose[] a strategic option for employers who might seek to evade liability . . .through willful blindness as to the source of reports and recommendations.").

This Court justifiably noted that the bar for employers in defending seemingly discriminatory decisions is high, and that the trial courts must be wary of the reality that "[e]mployers ordinarily are not so daft as to create or keep direct evidence of discriminatory purpose." *Figueroa v. Pompeo*, 923 F.3d 1078 (D.C. Cir. 2019). The D.C. Circuit's premonition is borne out by the evidence—and lack of evidence—in this case. The District Court acknowledged suspicious gaps in the record, noting that many witnesses "disavowed knowledge about what transpired," in deciding that Ruppe's skills and qualifications were not adequate to put her on the short list. Dkt. 88 at 8. In *Figueroa*, the D.C. Circuit held that at the summary stage, the district courts must "tackle the 'critical question of discrimination'" by taking into account the "unrebutted presumption of discrimination," and, specifically, analyze whether the employer has provided "adequate" evidentiary support as to why other candidates were better qualified than the plaintiff. 923 F.3d at 1087 (*citing Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)) (reversing the district court's finding of absence of "genuine issue of material fact" when the employer's justification for non-promotion amounted to "insufficiently substantiated assertions.").

Like in *Figueroa*, the defendant only provided insufficiently substantiated assertions as to why Ruppe's removal from the shortlist was due to her qualifications. Ruppe's bids demanded that she solicit supervisors, peers, and subordinates to

complete a "Candidate Tool" survey that rates the applicant on a scale of one to five (deficient to exceptional) on "leadership skills, management skills, interpersonal and communication skills, and substantive knowledge." Dkt. 88 at 5. Ruppe received uncharacteristically low scores in the survey for "her human resource management skills," in a manner that reasonably parroted her supervisors' biased sexist attitudes toward her management skills. *Id*. at 6. The defendant's justification for non-promotion was Ruppe's lower scores on the Candidate Tool assessment. Dkt. 77 at 14. This assertion was insufficiently substantiated and raised a dispute about a genuine issue of material facts. As Ruppe countered, the record evidence contradicted the defendant's assertions because one candidate with lower scores than Ruppe (Katherine Brucker) was short-listed for the position, and the selectee (Justin Friedman), himself, did not have a score at all. Dkt. 85-3 at 58-59; *see also* Dkt. 71-1 at 7 (SOF Def.'s SOF ¶¶33-35). Therefore, the reasons that the defendant articulated to justify Ruppe's removal from the short-list were insufficient, and there were genuine issues of material facts as to whether the non-selection was discriminatory. *Figueroa*, at 1088-89 ("The employer 'may not merely state that the employment decision was based on the hiring of the 'best qualified' applicant.'") (*citing Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003)).

The District Court's finding that Ziff's perception of Ruppe's disability in this same area did not cause an adverse reaction should be reversed, and the question of causation resolved by a jury.

In rejecting Ruppe's cat's paw theory, the District Court stated: "While plaintiff has had the opportunity to depose all of the relevant decisionmakers, she has not pointed to any evidence that Ziff made any effort to influence the decision made by the final selecting officials or conveyed a biased negative assessment to them." Dkt. 88 at 23 n.19. This position did not fully and adequately capture the parties discovery. Indeed, Ruppe filed a motion for evidentiary sanctions because the Agency has failed to preserve critical records in this case. Dkt. 49. While the District Court denied that motion without prejudice, Dkt. 63, the Court did not acknowledge that ongoing dispute between the parties about the adequacy of the record, in considering whether the cat paw theory should proceed to a jury and receive a more fact-intensive analysis. As the Court, in *Figueroa* noted, the employer's burden for establishing a legitimate, nondiscriminatory reason for its action is a relatively low burden because "the employer will always have the relevant records in its possession." *Figueroa*, at 1094. The fact that the Agency in this case betrayed that common understanding and admitted to have destroyed records that would have been relevant to the analysis presented the type of "mischief" that, like

*Figueroa*, should have guided the court towards denying summary judgment on this issue. *Id*.

## CONCLUSION

For all the foregoing reasons, this Court should reverse the District Court's grant of summary judgment for the Appellee, vacate the District Court's transfer to the Court of Federal Claims, and remand to District Court for trial on the merits for all counts.

Date:  March 7, 2025                Respectfully submitted,


                                    */s/ Kevin E. Byrnes*
                                    Kevin E. Byrnes, DC Bar No. 480195
                                    **Fluet**
                                    1751 Pinnacle Drive, Suite 1000
                                    Tysons, Virginia 22102
                                    T: (703) 590-1234
                                    F: (703) 590-0366
                                    KByrnes@fluet.law

                                    *Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 12,282 words, excluding the parts of the brief exempted by Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Date: March 7, 2025                    Respectfully submitted,


                                       */s/ Kevin E. Byrnes*
                                       Kevin E. Byrnes, DC Bar No. 480195
                                       **Fluet**
                                       1751 Pinnacle Drive, Suite 1000
                                       Tysons, Virginia 22102
                                       T: (703) 590-1234
                                       F: (703) 590-0366
                                       KByrnes@fluet.law

                                       *Counsel for Appellant*

## <u>CERTIFICATE OF SERVICE</u>

On March 7, 2025, I certify that the foregoing was served on all counsel of record for the Defendant in this matter via email/ECF as follows:

*/s/ Kevin E. Byrnes*
Kevin E. Byrnes, Esq.